IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOANNE WORK | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| HARTFORD LIFE AND ACCIDENT | : | NO. 04-2565 |
| INSURANCE COMPANY | : | |

O'NEILL, J.                                        NOVEMBER 15, 2005

<u>MEMORANDUM</u>

Plaintiff, Joanne Work, filed a complaint on June 14, 2004 under the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., claiming that

defendant, Hartford Life and Accident Insurance Co., wrongfully terminated her long term

disability benefits as a result of defendant's arbitrary and capricious determination that she was

not "disabled" as defined by her employer's long term disability insurance policy.  Before me

now are the parties' cross motions for summary judgment, the parties' responses, and plaintiff's

reply thereto.

BACKGROUND

I.      Work's Employment

Joanne Work was hired by the Brandywine Realty Trust on November 29, 1999 to work

as an administrative assistant for forty hours per week.  Her job involved answering phones

approximately fifty percent of the time, using the computer/keyboard twenty five percent of the

time, and sorting mail, faxes, and filing documents the remaining twenty five percent of the time.

The physical aspects of her job did not involve any balancing, stooping, kneeling, crouching,

crawling, reaching, working overhead, climbing, pushing, pulling, lifting, or carrying.

1

Occasionally, she was required to stand, walk, and use a keyboard.  She also was required to sit

with some frequency.  Work stopped working on May 9, 2000.  On May 15, 2000, Work suffered

severe injuries to her back as a result of a herniated disk and associated complications, including

sciatica, fibrosis, and bilateral knee problems.  She did not have any preexisting back problems.

II.      Long Term Disability Policy

        Work was covered by a long term disability policy issued by Hartford to Brandywine.

The policy defines "Disability or Disabled" to mean

        that during the Elimination Period[1] and for the next 24 months you are prevented by:
        1. accidental bodily injury;
        2. sickness;
        3. Mental Illness;
        4. Substance Abuse; or
        5. pregnancy,
        from performing one or more of the Essential Duties of Your Occupation, and as a result
        your Current Monthly Earnings are no more than 80% of your Indexed Pre-Disability
        Earnings.

The policy defines "Essential Duty" to mean "a duty that: 1. is substantial, not incidental; 2. is

fundamental or inherent to the occupation; and 3. can not be reasonably omitted or changed."

The policy defines "Your Occupation" to mean "your occupation as it is recognized in the

general workplace.  Your Occupation does not mean the specific job you are performing for a

--------

        [1]The policy defines "Elimination Period" to mean:

        the period of time you must be Disabled before benefits become payable.  It is the last to
        be satisfied of the following:
        1. the first 3 consecutive month(s) of any one period of Disability; or
        2. with the exception of benefits required by state law, the expiration of any Employer
        sponsored short term disability benefits or salary continuation program.

Brandywine paid Work's short term disability benefits during the first three months of her
disability.  Work's short term disability benefits are not at issue in this case.

specific employer or at a specific location." After the Elimination Period and the following twenty four months, the policy provides that "you must be so prevented from performing one or more of the Essential Duties of Any Occupation." The policy defines "Any Occupation" to mean "any occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than an amount equal to the lesser of the product of your Indexed Pre-disability Earnings and the Benefit Percentage and the Maximum Monthly Benefit shown in the Schedule of Insurance." The policy provides monthly benefits equal to seventy percent of an employee's pre-disability monthly earnings to begin after the elimination period.

The policy also restricts coverage for those with preexisting conditions. The policy provides:

> No benefit will be payable under the plan for any Disability that is due to, contributed to by, or results from a Pre-existing Condition, unless such Disability begins:
> 1. after the last day of 90 consecutive day(s) while insured during which you receive no medical care for the Pre-existing Condition; or
> 2. after the last day of 365 consecutive day(s) during which you have been continuously insured under this plan.

The policy defines "Preexisting Condition" to mean:

> 1. any accidental bodily injury, sickness, Mental Illness, pregnancy, or episode of Substance Abuse; or 2. any manifestations, symptoms, findings, or aggravations related to or resulting from such accidental bodily injury, sickness, Mental Illness, pregnancy, or Substance Abuse;
> for which you received Medical Care during the 90 day period that ends the day before:
> 1. your effective date of coverage; or
> 2. the effective date of a Change in Coverage.

Lastly, the policy vests Hartford with "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy" and states that "[a]ll proof submitted must be satisfactory to us."

3

III.    Work's Long Term Disability Claim

Work submitted her long term disability application, dated July 28, 2000, to Sabrina

Coleman at Hartford.  Thereafter, Coleman began to gather information from Work's physicians

regarding her medical condition and other information from her employer.

Work was first treated by Dr. Catherine Bergan, her primary care doctor.  Under Dr.

Bergan's supervision, Work underwent an MRI of her lumbar spine by Dr. Leon Rapko on May

1, 2000, which revealed: "1) degenerative disc disease at L5/S1 and 2) mild spondylolisthesis at

L5/S1."  In a letter dated May 4, 2000, Dr. Michael Ward reported to Dr. Rapko:

> Joanne gives a history of chronic low back and left leg pain which recently has
> gotten worse.  She has been treated with a course of therapy and also anti-inflammatories
> with no significant relief in her pain.  She currently is taking Percocet to help alleviate her
> pain.  She denies any bowel or bladder symptoms.  Her recent MRI is consistent with
> spondylolistesis, degenerative disc disease and also a herniated disc at L5/S1.
>       On physical exam she has very limited motion with significant tenderness over the
> left sciatic notch.  Sitting root test is positive on the left side.  Her reflexes are
> symmetrically decreased in both lower extremities.  There is numbness in the L5/S1
> distribution with no motor deficit.
>       His [sic] diagnosis is a herniated L5/S1 disc.  I discussed two treatment options
> with her, i.e., an epidural steroid injection or surgical excision of the herniated disc.

Work was also treated by Dr. Kevin Mansmann on May 19, 2000.  Dr. Mansmann diagnosed

Work as suffering from an L5-S1 herniated disc with bilateral leg pain, low back pain, and leg

weakness.  Dr. Mansmann performed a CT scan and myelogram on June 22, 2000.  The CT scan

showed "a moderate sized central disc protrusion with disc material extending caudal to the disc

space level" at the L5-S1 level.  The myelogram revealed a "moderately advanced degernative

change at the L5-S1 level with intervertebral disc space narrowing, hypertorphic spurring and

sclerosis."  On July 11, 2000, Dr. Mansmann performed back surgery on Work for the removal of

a herniated disc at L5-S1.  Following this surgery, on July 25, 2000, Dr. Mansmann completed a

short term disability certificate estimating that Work's condition would last approximately three months from the date of surgery. On August 2, 2000, Dr. Mansmann opined that Work was subject to the following restrictions on her activities: (1) she "must be able to change position/limited standing"; (2) "prolonged walking prohibited, limited walking, change of position as needed, short distances only"; (3) "no prolonged sitting, latitude to change positions as needed"; (4) "no lifting/carrying [greater than five pounds], no prolonged lifting/carrying, no repetitive lifting/carrying"; (5) "no pushing"; (6) "no pulling"; (7) "limited driving/change of position required"; (8) "no limitation [on keyboard use,] no prolonged standing, no lifting or carrying more than five pounds, no repetitive lifting or carrying, no prolonged lifting or carrying, no pushing, no pulling, and limited driving. Dr. Mansmann estimated that her physical limitations would last twelve weeks from the date of her surgery.

Following an examination of Work's medical records, Hartford determined that Work was disabled and began paying her disability benefits on August 15, 2000. Thereafter, Hartford regularly requested and received documentation to support Work's claim of continuing disability. On September 18, 2000, her physical therapist reported that she "could not tolerate message or pressure on [her] back" and that she was "unable to tolerate exercise out of water." He also "gave her a back brace to prevent irritation because she continues housework [and] painting chores; brace was helpful." As of September 25, 2000, Dr. Mansmann believed that Work was "still unable to return to work" and had "no idea at this time when she will be able to return to work." By letter dated September 26, 2000, Coleman wrote to Work informing her that her long term disability claim had been approved. The letter further: (1) requested her cooperation in furnishing Hartford with information regarding her continuing disability; (2) reminded her that

"benefit payments will continue, subject to the terms and limitations of the policy, while you meet the policy definition of Disability"; (3) informed her that "[t]he medical information we have on file indicates that your condition may permit you to return to work full-time as of October 11, 2000"; and (4) requested that "[i]f you are unable to return as anticipated, please have your surgeon fully complete the enclosed Attending Physician's Statement and return it to our office by October 15, 2000."

On October 3, 2000, Dr. Mansmann opined that Work was restricted as follows: (a) "needs ability to [change] position as necessary" when standing, walking, or sitting; (b) no lifting greater than ten pounds; (c) no pushing or pulling greater than fifteen pounds; (d) no driving greater than one half hour; and (e) no limitations on keyboard use or repetitive hand motion.  Dr. Mansmann similarly opined on October 18, 2000 that Work's activities were limited in the following ways: (i) "needs latitude to change position as needed" when standing and walking; (ii) "no prolonged sitting, needs latitude to change position as needed"; (iii) "no lifting/carrying [greater than ten pounds]"; (iv) no pushing or pulling greater than fifteen pounds; (v) no driving greater than one half hour; (vi) keyboard use/repetitive hand motion was okay, but "must not be prolonged sitting"; and (vii) "no repetitive twisting, turning, bending."  Dr. Mansmann estimated that these limitations would last two months.

On November 1, 2000, Dr. Mansmann diagnosed Work with the same low back pain, foot numbness, and leg/foot weakness following her L5-S1 discectomy.  Dr. Mansmann opined that Work's activities continued to be limited in the following ways: (1) "needs latitude to [change] position as needed" when standing; (2) "needs latitude to change position [pro re nata]" when walking; (3) "no prolonged sitting, needs latitude to [change] position [pro re nata]"; (4) "no

lifting/carrying [greater than ten pounds]"; (5) "no repetitive motion, no weight"; (6) no pushing

or pulling greater than fifteen pounds; (7) no driving greater than one half hour; (8) keyboard

use/repetitive hand motion okay as long as no prolonged sitting; and (9) "no repetitive twisting,

turning, bending."  In a letter dated the same day, Dr. Mansmann wrote to Dr. Catherine to report

that four months after the L5-S1 discectomy:

> She stated that she has had no significant change in pain since her last visit and spent the
> last three days in bed.  She stated injections on 10/18/00 gave her approximately three
> days relief.  She stated, however, that overall she is 45% improved.  She has been
> experiencing bilateral numbness in her feet, more so on the right than on the left.  She is
> also experiencing pain in her buttocks which prevents her from sitting.  This pain seems
> to be worse in the morning.  She uses a lumbosacral support without any relief.
>       Physical examination reveals a 75% range of motion with pain at extremes.  She
> toe/heels OK.  She has low back pain with sitting root test.  X-rays show a L5-S1 minimal
> disk space height.
>       Assessment is she has continued low back pain status post L5-S1 diskectomy.
> Plan is that she will have a bone scan to assess the facet joint arthritis in the sacroiliac
> joint.

On November 14, 2000, Dr. Mansmann completed a "Physical Capacities Evaluation Form" on

behalf of Work which stated that in an eight hour work day she can sit for three to four hours,

stand for two to three hours, walk for two to three hours, and drive for one to two hours with rest.

Dr. Mansmann also reported: (a) that Work could lift weights of one to ten pounds constantly

(67-100%), weights of eleven to fifteen pounds occasionally (0-33%), and never weights over

fifteen pounds; (b) that she could do reaching, handling, fingering, and feeling frequently (34-

66%), balancing, stooping, and crouching occasionally (0-33%), and never climbing, kneeling,

and crawling; (c) that she had intermittent capacity to use both feet; and (d) that he felt

comfortable that she was capable of performing sedentary work, defined as:

> lifting ten pounds maximum and occasionally lifting and/or carrying such articles as
> dockets, ledgers, and small tools.  Although a sedentary job is defined as one which
> involves sitting, a certain amount of walking and standing is often necessary in carrying

out job duties.  Jobs are sedentary if walking and standing are required only occasionally and other sedentary criteria are met.

In a letter dated November 17, 2000, Dr. Mansmann wrote Dr. Bergan to follow up on his previous report: "Assessment is residual lumbar pain.  Plan is she was given two local cortison injections.  She is not to do any heavy lifting, gradually increase her activities and go for a second opinion."  On November 27, 2000, Work reported in a telephone conversation with Hartford that she:

> went to Philadelphia to consult with a spine specialist who conducted another MRI which showed mass scar tissue on the bottom of her spine.  This is the reason why she's been in severe pain on her bottom and clmt. has been scheduled for epidural injections one is scheduled for December 12, 2000 with an anesthesiologist and [sic] January 3, 2001.  Clmt. said that any reports can be obtained from her physician Dr. Mansmann.  Clmt. hopes that mid January 2001 she should be improved she said that "she wants her life back."  Informed clmt. we will need an update for January 2001.

On December 19, 2000, Dr. Mansmann reported that Work's condition had worsened.  Specifically, he reported that the result of a November 14, 2000 bone scan showed "increased uptake [at] L5-S1 [and] degeneration," that the result of an August 28, 2000 MRI showed "disc degeneration L5-S1 [and] broad disc protrusion [and] facet joint DJD," and that she exhibits "tenderness [in her] bilat[eral] SI joints, 75% [range of motion], and pain."  He also reported that her activities are limited in the following ways: (i) standing for "[less than] 25 min[utes] continually with ability to change position as needed"; (ii) walking for "[less than] 20 min[utes] with ability to change position as needed"; (iii) sitting for "[less than] 20 min[utes] with ability to change position as needed"; (iv) lifting/carrying less than fifteen pounds occasionally; (v) reaching/working overhead occasionally; (vi) pushing and pulling less than twenty pounds; (vii) driving "[less than] 30 min[utes] [with] breaks as necessary"; and (viii) keyboard use/repetitive hand motions "OK."  Dr. Mansmann could not estimate how long these limitations would last.

8

On December 22, 2000, Work similarly reported to Hartford in a "Claimant Questionnaire": (1) that she "cannot sit without severe back pain, numbness to feet, can bend--cannot stand/walk [without] pain in lower back and feet [and] legs get numb and weak," with no change in her condition for eight and one half months; (2) that she "rest[s] 80% laying on her side(s), take[s] short walks per [doctor's instructions] in yard [and] around house, no housework allowed--i.e. bending, lifting, carrying"; (3) that she no longer engages in "landscaping, gardening, summer boating"; and (4) that she does not do anything around the house without her daughter's assistance.  Thereafter, on March 7, 2001, Hartford noted that "medical documentation received from Dr. Mansmann confirming the clinical findings of the limitations reported."

By letter dated April 17, 2001, the Social Security Administration informed Work that her conditions did not qualify her for benefits because the Regional Commissioner determined that she was not disabled as her condition was not severe enough to keep her from working.  By letter dated July 18, 2001 to Work's family doctor, Dr. Mansmann recounted his visit with Work one year after her discectomy:

> She stated her pain has decreased in the left posterior thigh.  Her back gives way and the pain is extreme.  She has shooting pains in her back since 6/15/01.  Her back gave way and the patient fell and hit her face on a sink, breaking her nose.  She is scheduled for surgery in 7/20/01.  She stated she had three epidural steroid injections and the 3rd on 1/1/01 gave her temporary relief.  Her second injection in December 2000 gave her no help, and with the first injection in December of 2000 the pain increased while treating.

On August 8, 2001, Work underwent an MRI of the lumbar spine following Dr. Mansmann's referral.  The radiologist reported, inter alia:

> Very mild concentric disc bulge L5/S1 without significant disc herniation.  Improved appearance from earlier CT myelogram.  Mild degree of enhancement anterior to the thecal sac.  A very shallow left posterolateral disc bulge L3/4.  Mildly congenitally narrowed canal.

9

On August 24, 2001, Dr. Mansmann completed an "Attending Physician's Statement of Continued Disability" reporting that Work suffered from the same problems and that an August 8, 2001 MRI also revealed that Work suffered from a "disk bulge [at] L3-L4."  Dr. Mansmann opined that Work's abilities were limited further: (a) she "needs latitude to change position as needed" when standing, walking, and sitting; (b) "no lifting/carrying"; (c) no pushing or pulling greater than ten pounds; and (d) no driving for greater than one half hour.  Dr. Mansmann also estimated that these limitations would continue indefinitely.

In a letter dated October 11, 2001 Work reported to Hartford, inter alia, that she had completed two of a series of three injections to her spine and that she would be seeing a new doctor at the Rothman Institute to treat the scar tissue in her spine, disc deterioration, and the narrowing diagnosed by Dr. Mansmann.  On November 15, 2001, Dr. Mansmann completed another physical capacities evaluation form on behalf of Work which stated: (a) that Work could lift weights of one to ten pounds occassionally (0-33%) and never weights over ten pounds; (b) that she could do stooping, kneeling, crouching, crawling, reaching above shoulder and at waist level, handling, fingering, and feeling occasionally (0-33%) and never climbing, balancing, and reaching below waist level; (c) that she had capacity to use both feet and hands; (d) that she "needs latitude to change position as needed"; (e) that these restrictions are permanent; and (f) that she had reached her maximum medical improvement.

On December 20, 2001, Work called Hartford and stated that she was very upset that no one has returned her calls and reported that Dr. Mansmann says that she

10

> has permanently been disabled [,] has severe scar tissue on spinal column [and] discs are
> deterioating [sic] said dr jacobs has done approx[.] 12 steroid injections [,] wont [sic]
> touch her anymore because her spine is so deteriated [sic] [,] said she was referred to dr
> liness [and] has to review her entire file before he will accept [,] he as a patient does not
> understand what else is needed

In January 2002, another examiner, Jaime Hebbard, took over for Coleman in handling Work's

claim.  After reviewing Work's claim, Hebbard performed a "walk up with clinical" and

determined that Work "no longer meets the definition of [disability]."  Hebbard did not request

an independent medical examination.

IV.    Hartford's Decision to Terminate Work's Long Term Disability Claim

In a letter dated January 14, 2002, Hartford notified Work that her long term disability

benefits were being terminated because Hartford determined that she no longer met the definition

of disabled or disability.  Basing its decision on the Group Benefit Plan Booklet for the long term

disability policy, Work's Job Description, Brandywine's Claim Statement dated August 15,

2000, Work's Physical Capacities Evaluation Form completed by Dr. Mansmann dated

November 15, 2001, and Work's Attending Physician's Statement completed by Dr. Mansmann

dated August 24, 2001, Hartford determined that she did not meet the definition of disability

because her occupation as an Administrative Assistant could be done by alternating sitting and

standing, with the ability to change position as needed, and without having to lift or carry more

than ten pounds.  Specifically, Hartford wrote in the letter:

> Your employer reports your occupation as an Administrative Assistant to include
> duties of answering phones; keyboarding; sorting mail and faxes; and filing requiring you
> to sit, stand, use repetitive hand motion.  Your employer reports that this can be done by
> alternating sitting and standing.
> Your physician reports on the Physical Capacities Evaluation dated 11/15/01 that
> you need to be able to change position as needed and can not lift or carry more than 10
> pounds.
> Based on the above occupational and medical information, you no longer meet the

definition of Disability as of 01/01/2002.  Therefore, no further benefits are payable to
you beyond 12/31/2001.

Hartford further informed Work that if she had any additional information to submit to Hartford

that may assist it in evaluating her claim for long term disability benefits, she should forward that

information to Hartford within sixty days.  Hartford also informed her that if she disagreed with

this termination of benefits, she file an appeal of that decision under ERISA.

V.      Work's Appeal of Hartford's Decision

        On March 13, 2002, Work wrote to Hartford stating her disagreement with its decision to

terminate her benefits.  Specifically, she stated that she has "had Dr. Mansmann send [Hartford]

documentation advised that I am unable to work due to the scare [sic] tissue (fibrosis) that has

formed in my spinal column post my back surgery.  This document is sufficient evidence that I

am defined as Disabled and meet the requirements to continue to receive my disability earnings."

Moreover, she stated: "I have offered to see any physician your [sic] can advise to help with my

back.  I will offer again to have myself available for a medical evaluation, MRI's...what ever [sic]

it takes for your office to understand the pain in which I bare [sic] each day, and my diligence to

get my life back."  Although Hartford concedes that examiners have the right under the policy to

obtain an independent medical examination, this right was not exercised.  Dr. Mansmann also

submitted a letter dated March 6, 2002 stating that he saw Work on February 28, 2002 "for

follow up on risidual [sic] sciatica" and that she "is to remain out of work secondary to sciatica

[second] to fibrosis."

        Work's appeal was assigned to Daniel Connors, a BMS Appeal Specialist at Hartford's

claims office in Connecticut.  By letters dated April 15, 2002, Connors conducted an additional

investigation into Work's claim and requested Work's medical records dating back to July 1,

12

1999, in order to determine whether Work had any preexisting back problems.  Connors also

ordered a paper review of Work's medical records from University Disability Consortium,

physician specialists for disability evaluation and management, in order to facilitate the review of

Work's medical records.  On April 17, 2002, Dr. John Kraus examined Work at the request of

Dr. Mansmann.  After reviewing her medical history and discussing his physical exam, Dr. Kraus

recommended to her that she pursue a physical rehabilitation program to control her pain and

declined to prescribe a narcotic analgesic for her at that time.  Work told Dr. Kraus she would

think over their discussion and get back to him.  She did not contact Dr. Kraus after that meeting.

In a UDC report prepared on June 6, 2002, Dr. Elizabeth Roaf, compared Work's job

duties with her medical records dating from August 1999 to June 2002, which included: (1)

treatment by Dr. Huxster in August 1999 for a right knee injury following a fall while walking

down some steps; (2) treatment on July 19, 1999 for persistent pain in her lower back following a

jump off an eight foot height and six years of episodic back pain; (3) a follow up visit and X-ray

on July 28, 1999 showing arthritis of one disc and pain in the buttocks; (4) physical exam and

MRI of the spine on April 27, 2000 for back pain; (5) review of the MRI on May 1, 2000

showing mild spondylolisthesis at L5-S1, degenerative disc disease at L5-S1, and mild posterior

central disc herniation with inferior extrusion; (6) a May 4, 2000 letter from Dr. Michael Ward to

Dr. Leon Rapko describing Work's history of chronic low back pain and left leg pain recently

exacerbated with a diagnosis of herniated L5-S1 disc; (7) office notes dated May 2000

documenting the pain experienced by Work under the name Joanne Hines; (8) a May 19, 2000

letter from Dr. Mansmann to Dr. Bergan stating that Work has had intermittent low back pain for

six years in connection with L5-S1 herniated disc that has not been fully resolved and that was

aggravated when she fell from the platform; (9) an April 26, 2002 letter from Dr. Bergan to Connors that stated on July 2, 1999 Work was treated by Dr. Rapko for a back injury sustained while shoveling; and (10) Dr. Mansmann's May 19, 2000 notes discussing Work's low back pain, reinjury in July from fall off six to eight foot platform, attempts at physical therapy without improvement, persistent pain when lifting, and episodes of bilateral leg pain.

This report also included a review of: (11) Dr. Mansmann's June 12, 2000 note from a follow up visit discussing Work's first epidural steroid injection that increased her pain; (12) Dr. Mansmann's June 12, 2000 prescription that Work should not be at work; (13) Dr. Mansmann's June 12, 2000 letter to Dr. Bergan summarizing his notes; (14) Dr. Mansmann's June 20, 2000 physician's certification of short term disability; (15) Dr. Mansmann's August 24, 2000 prescription for physical therapy; (16) Dr. Mansmann's June 19, 2000 office notes discussing Work's sensation in her feet and plan for surgical discectomy and CT myelogram; (17) Dr. Mansmann's July 21, 2000 post surgical physical examination of Work, noting pain underneath the incision and no leg pain; (18) a July 11, 2000 operative note detailing preoperative diagnosis of L5-S1 herniated disc; (19) operation X-rays of lumbar spine; and (20) a June 22, 2000 CT lumbar spine film showing moderate size central disc protrusion at L5-S1.

Dr. Roaf also reviewed: (21) a July 11, 2000 surgical pathology report showing disc material with fibrocartilaginous tissue fragments; (22) Dr. Mansmann's August 21, 2000 office notes showing eighty percent improvement and seventy five percent range of motion but still significant pain six weeks after surgery; (23) an August 28, 2000 MRI of lumbar spine showing disc degeneration at L5-S1 with mild broad based disc protrusion and some facet joint DJD; (24) Dr. Mansmann's November 1, 2000 office notes and letter to Dr. Bergan discussing residual

14

fibrosis, forty five percent improvement seventy five percent range of motion, and no significant decrease in pain; (25) a November 14, 2000 bone scan showing increased L5-S1 degeneration; (26) Dr. Mansmann's November 17, 2000 letter to Dr. Bergan discussing tenderness at the sacroiliac joints and recommendation that Work not do any heavy lifting; (27) a January 22, 2001 record that after steroid injections Work still could not sit in chair for more than ten minutes, that Dr. Cottler suggests physical therapy, that Work was leaving for Puerto Rico soon, and that straight leg test registered pain in right and left legs; (28) Dr. Mansmann's July 28, 2001 follow up showing that pain had increased and was radiating to left posterior thigh; (29) Work's June 15, 2001 incident where her back gave way and she broke her nose on the bathroom sink; and (30) an August 8, 2001 MRI with gadolinium showing narrowing of lumbar intervertebral disc spaces.

Her report also noted: (31) a May 2000 discharge instructions from Jefferson Health System; (32) Dr. Mansmann's September 21, 2000 physical therapy prescription for home aquatic treatment; (33) Work's claimant questionnaire; (34) Dr. Kraus' April 17, 2002 rehabilitation works report discussing Work's history of cervical cancer, broken bones, and bilateral knee dislocation, difficulty enjoying life's pleasures, and sensations of low back pain; (35) Dr. Mansmann's August and November 2001 statements of disability; and, finally, (36) the December 2000 epidural series physician assessment.

In her report, Dr. Roaf highlighted the following objective data:

Joanne Work underwent an L5-S1 discectomy on 7/11/00. Lumbar survey AP and lateral 7/11/00, showed a needle at the L5 spinous process localizing behind the body S1.

CT lumbar spine contrast dated 6/22/00, showed a moderate sized central protrusion at the L5-S1 level with extension. Lumbar myelogram showed no definite abnormality dated 6/22/00. Surgical pathology report showed disc material from L5-S1

with fragment fibrocartilage showing reactive and degenerative changes.  Blood work dated 7/3/00, showed a normal white-blood-cell count hematocrit, platelet count INR, PTT, and bleeding time.

MRI of the lumbar spine dated 8/28/00, showed disc degeneration at L5-S1 with mild broad-based disc protrusion and some facet joint DJD.  No evidence of HNP or foraminal stenosis at any level and recurrent disc herniation, disc space infection or arachnoiditis appreciated.

Bone scan noted and dated 11/14/00, showed increased uptake at L5.  S1 consistent with degenerative change.

MRI with gadolinium dated 8/8/01, showed mild narrowing with lumbar intervertebral disc space, particularly at the L5-S1, along with some congenital mild narrowing of the spinal canal and degenerative facet changes at L4-5 that are mild.

Dr. Roaf also contacted Drs. Kraus and Mansmann for further discussions.  Dr. Roaf diagnosed her as suffering from "degenerative joint disease at the L5-S1 level" and "status post herniated nucleus pulposes L5-S1 with excision of disc material."  Dr. Roaf summarized Work's spinal condition:

Ms. Work has had chronic low back pain for greater than six years.  She has had exacerbations of her back pain with gardening, and was noted on an MRI to have some spondylolisthesis of the L5-S1 joint, as well as degenerative changes of the L5-S1 disc in addition to the herniated disc.  She underwent an excision of the herniated disc on 7/11/00, by Dr. Mansmann.

Post-operatively initially did well, but subsequently developed worsening pain and has been unable to do her usual activities, despite the surgery.  She had three epidural steroid injections without relief.  Follow-up scans were done to rule out infections process or re-herniation of the disc.  These studies simply showed degenerative changes of the L5-S1 disc.

In April 2002, the patient saw Dr. Krauss [sic] at Brimar [sic] Rehab.  She saw him once for an initial evaluation and agreed to treatment at the rehabilitation center, but was unable to keep subsequent appointments on 5/11 or 5/14.

Dr. Roaf also commented:

If [sic] is unfortunate that Ms. Work has been unable to participate with the rehabilitation process at Brimar [sic] Rehab.  Frequent rehabilitation of spondylolisthesis requires strengthening of the spine to help promote spinal stability and prevent further worsening of the condition.  Additionally, this promotes strengthening, as well as flexibility, which can assist patients in maximizing their function.

Accordingly, Dr. Roaf determined that as of January 1, 2002 she:

> appears functional at a sedentary level with restrictions of no lifting greater than 10 lbs.
> The ability to change posture when needed and never climbing or balancing, but
> occasionally stooping, kneeling, crouching, crawling, reaching above the shoulder or
> waist level, but never below the waist level.  The claimant should be able to handle,
> finger and feel, as well as use right and left feet and right and left hands without
> repetitivity, as well as no prolonged sitting and limited standing with frequent position
> changes.  These limitations are predominantly to help alleviate the patient's pain.  There
> are no demonstrated limitations related to medication effects.

Dr. Roaf therefore concluded that "I do think that on 11/1/02 the claimant should be able to

function at a sedentary level at a full-time position."

In a follow up letter, Dr. Roaf reported the substance of Dr. Mansmann's view of Work's

condition:

> You stated that Ms. Work had a L5-S1 disc herniation, underwent discectomy and
> subsequently developed fibrosis in that region with results in sciatic pain.  She has
> complained of persistent pain since that time and has undergone three epidural steroid
> injections without good relief of her pain.  Although she has not had an EMG nerve
> conduction study, you believe that the symptoms are real because of the fibrosis that is
> seen on the MRI study.
> . . . You stated were she able to return to work she would certainly need frequent
> position changes, the ability to sit and stand when needed.  You stated that she is clearly
> uncomfortable in either position when she has been in the office.
> Certainly if Ms. Work were to return to work, it would be in a sedentary capacity
> and you felt that it is possible that she might be able to perform some part-time position at
> a sedentary level.  You indicated that pushing, pulling, lifting more than five pounds or
> twisting would be appropriate.

Hartford denied Work's appeal by letter dated June 17, 2002 to Work's previous attorney,

Thomas Pitt.  In that letter, Hartford stated that it based its determination on the evidence

discussed in its January 14, 2002 letter denying Work's initial claim, her letter dated March 13,

2002, and:

1. 7/20/99-8/23/99 Records from CVS Pharmacy
2. 3/6/02 Statement from Kevin A. Mansmann, MD
3. 4/17/02 Medical Record from Bryn Mawr Rehabilitation

    4. 4/26/02 Statement from Catherine Bergan, DO
    5. 8/23/99-5/23/00 Medical Records from Michael Ward, MD
    6. 6/6/02 University Disability Consortium Medical Review.

Relying on these items of evidence, Hartford adopted Dr. Roaf's analysis and concluded that

Work "is capable of full time sedentary work with limitations outlined [by Dr. Mansmann] to

help alleviate pain.  The limitations described would not preclude Ms. Work from performing her

occupation as required by her employer."  Hartford thus upheld its termination of Work's

disability benefits.

       Following the denial of her appeal, Work regularly submitted evidence of her continuing

medical treatment.  Hartford has declined to reconsider its termination of benefits.

STANDARD OF REVIEW

       Rule 56(c) of the Federal Rules of Civil Procedure provides, in relevant part, that

summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R.

Civ. P. 56(c) (2004).  The moving party "bears the initial responsibility of informing the district

court of the basis for its motion, and identifying those portions . . . which it believes demonstrate

the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986).  After the moving party has filed a properly supported motion, the burden shifts to the

nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."  Fed.

R. Civ. P. 56(e) (2004).

       I must determine whether any genuine issue of material fact exists.  An issue is genuine if

the fact finder could reasonably return a verdict in favor of the non-moving party with respect to

18

that issue.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is material only

if the dispute over the facts "might affect the outcome of the suit under the governing law."  Id.

In making this determination, I must view the facts in the light most favorable to the non-moving

party, and the non-moving party is entitled to all reasonable inferences drawn from those facts.

Id.  However, the nonmoving party may not rest upon the mere allegations or denials of the

party's pleading.  See Celotex, 477 U.S. at 324.  The non-moving party must raise "more than a

mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and

cannot survive by relying on unsupported assertions, conclusory allegations, mere suspicions.

Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989).  If the evidence for the

nonmoving party is merely colorable, or is not significantly probative, summary judgment may

be granted.  Anderson, 477 U.S. at 249-50 (citations omitted).

   Cross motions are merely claims by each party that it alone is entitled to summary

judgment; they do not constitute an agreement that if one is denied the other is necessarily

granted, or that the losing party waives judicial consideration and determination of whether

genuine issues of material fact exist.  Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir.

1968).  If any such issue exists it must be disposed of at trial and not on summary judgment.  Id.

In the present case, there are no genuine issues of material fact.  Both parties agree on the

material facts and refer to the same standardized record.  Therefore, this case is properly decided

as a matter of law.  The only issue before me is whether, as a matter of law, Hartford's decision

to deny Work long term disability benefits was arbitrary and capricious.  I hold that it was not.

DISCUSSION

I.      ERISA Standard of Review

The subject matter of this case is litigated frequently in this Court and the legal principles

in this area are well established.  See generally Gigante v. Prudential Ins. Co. of Am., No.

04-0780, 2005 WL 670696 (E.D. Pa. Mar. 22, 2005).  Where the administrator of a long term

disability plan has discretion to interpret the plan and determine whether benefits are available to

an injured employee, the administrator's exercise of discretion is judged by an arbitrary and

capricious standard.  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989);

Abnathya v. Hoffman-LaRoche, Inc., 2 F.3d 40, 45 (3d Cir. 1993).  "Under the arbitrary and

capricious standard, an administrator's decision will only be overturned if it is without reason,

unsupported by substantial evidence or erroneous as a matter of law."  Pinto v. Reliance Standard

Life Ins. Co., 214 F.3d 377, 387 (3d Cir. 2000).  Courts are not free to substitute their own

judgment for that of an administrator absent such a showing.  Id.  Moreover, when reviewing an

administrator's determination, courts may only review the evidence that was before the

administrator at the time of its determination.  Mitchell v. Eastman Kodak Co., 113 F.3d 433,

440 (3d Cir. 1997).  However, courts may examine evidence outside of the administrative record

when determining the degree of the conflict of interest.  Pinto, 214 F.3d at 395.

Where, as here, an insurance company determines the eligibility for benefits and also pays

benefits out of its own funds, courts presume a conflict of interest because the insurance

company is presumed to have "an active incentive to deny close claims in order to keep costs

down and keep themselves competitive so that companies will choose to use them as their

insurers."  Id. at 388.  Therefore, where there is this conflict of interest on the part of

20

administrators, courts review the denial of benefits under a "heightened arbitrary and capricious" standard. Pinto, 214 F.3d at 387. The parties do not dispute the application of this standard or the inherent conflict of interest because Hartford had sole discretionary authority to determine eligibility for disability benefits and funds the payment of those benefits.

Under this heightened standard, courts apply a sliding scale which takes into consideration the degree of conflict on the part of the administrator: the greater the evidence of conflict, the greater the degree of scrutiny (i.e. the less deferential the standard). Id. at 389. In determining the level of conflict, courts evaluate numerous factors: (1) the sophistication of the parties; (2) the information accessible to the parties; (3) the exact financial arrangement between the insurer and the company; and (4) the status of the administrator, as the company's financial or structural deterioration might negatively impact the presumed desire to maintain employee satisfaction. Id. at 392. Courts also evaluate the presence of procedural anomalies, bias, or unfairness in determining the level of scrutiny applied to an administrator's decision. Id.

I find that these factors show that Hartford has a moderate conflict of interest in determining Work's eligibility for disability benefits. See generally Stratton v. E.I. Dupont de Nemours & Co., 363 F.3d 250, 254 (3d Cir. 2004). I presume a sophistication imbalance. Hartford, as a large insurance company, is likely to be more sophisticated with respect to insurance claims and presumably deals with numerous such claims on a regular basis. I also presume that this is Work's first ERISA or insurance claims experience. This factor cuts in favor of elevating the standard of review. There does not appear to be an imbalance with respect to information accessibility. A review of the record shows a conscientious effort by each party to keep the other apprised of the information it had at its disposal. This second factor does not

implicate the standard of review.  Evidence with respect to the third and fourth factors is not

apparent in the record; however, I presume that Hartford is in a healthy and robust financial

condition.  Neither of these two factors serve to elevate the standard or review.  Overall, these

factors weigh in favor of slightly heightening the standard of review.

Courts applying these factors have been on the low end of the sliding scale when there is

no evidence of conflict other than the inherent structural conflict.  Lasser v. Reliance Standard

Life Ins. Co., 344 F.3d 381, 385 (3d Cir. 2003).  At the low end of the sliding scale, "a plan

administrator's decision will be overturned only if it is clearly not supported by the evidence in

the record or the administrator has failed to comply with the procedures required by the plan."

Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., 222 F.3d 123,

129 (3d Cir. 2000).  Courts have been on the high end when there is evidence of procedural

anomalies, bias, or unfairness, even where there is no evidence of an inherent structural conflict.

See Pinto, 214 F.3d at 394.  Although there is no exact formula for reviewing an administrator's

determination at the high end of the scale, where courts have found evidence of procedural

anomalies, bias, or unfairness, they have applied significantly greater scrutiny to an

administrator's determination.  See id.  For example, courts have applied a higher standard of

review where the administrator: (a) relies on the opinions of non-treating physicians over those of

treating physicians without explanation, Kosiba v. Merck & Co., 384 F.3d 58, 67-68 (3d Cir.

2004); (b) fails to follow the plan's notification provisions and conducts self-serving paper

reviews of medical files, Lemaire v. Hartford Life and Accident Ins. Co., 69 Fed. Appx. 88 (3d

Cir. 2003); (c) bases its negative decision on inadequate information and incomplete

investigations, Friess v. Reliance Standard Life Ins. Co., 122 F. Supp. 2d 566, 574-75 (E.D. Pa.

2000); (d) reverses an earlier decision allowing benefits without any new evidence that supports the reversal, Pinto, 214 F.3d at 394; (e) selectively relies on favorable parts of medical reports while ignoring unfavorable parts, Pinto, 214 F.3d at 394; (f) ignores the recommendations of its own claims managers that benefits should be awarded, Pinto, 214 F.3d at 394. See also Wright v. Matrix Absence Mgmt., Inc., No. 03-6160, 2005 WL 475173, *3 (E.D. Pa. Mar. 1, 2005) (discussing cases).

Work appears to argue that Hartford exhibited procedural anomalies, bias, and unfairness in its termination of her benefits because: (A) Hartford reversed its earlier decision awarding her benefits without any new evidence to support the reversal and at the same time that Hebbard took over handling Work's claim from Coleman;(B) Hartford relied on the opinions of nontreating physicians over those of treating physicians without explanation; (C) Hartford selectively relied upon favorable parts of medical reports while ignoring unfavorable parts; and (D) Dr. Roaf conducted a self-serving paper review of Work's medical files during her appeal.

A.      Reversal Of Previous Decision

Work appears to argue that Hartford's reversal of its initial award of disability benefits was biased and irregular because: (i) the decision took place around the same time that Hebbard took over handling Work's claim from Coleman; (ii) the decision was not supported by additional evidence; and (iii) her medical condition had worsened, not improved.  The evidence does not support these arguments.  When Work's claim was managed by Coleman, Hartford determined that Work met its definition for disability based upon information that predated September 26, 2000 and with the belief that her condition would permit her to return to work full time by October 11, 2000.  Work was further informed by letter of that date that her "benefit

23

payments will continue, subject to the terms and limitations of the policy, while you meet the policy definition of Disability." The determination as to whether Work met the policy definition of disability appears to have been made on a regular basis as Work continued to supply Hartford with new and up-to-date medical records from her various doctors. Between the period of September 26, 2000 through October 11, 2000 and continuing until the Fall of 2001, the evidence shows that Work's condition improved at some points and worsened at other stages of her recovery. During this time period, Hartford determined that Work met its definition of disability. However, upon review of Dr. Mansmann's physical capacities reports of August 24, 2001 and November 15, 2001 it appeared that Work had reached a plateau in her recovery as she had reached her maximum medical improvement. It appears that this plateau rather than the change in claims specialists facilitated a new determination with respect to Work's claim. By the Fall of 2001, it was Dr. Mansmann's opinion that Work's activities were limited in the following ways: (1) needs latitude to change position as needed when standing, walking, or sitting; and (2) no driving greater than one half hour. However, Dr. Mansmann opined that Work could do the following: (a) lifting, carrying, pushing, or pulling of anything under eleven pounds; (b) stooping, kneeling, crouching, crawling, reaching above shoulder and waist levels, handling, fingering, and feeling occasionally; and (c) using both feet and hands. Based on Dr. Mansmann's opinion, Hartford determined that Work did not meet the definition of disability because her sedentary job as an administrative assistant could be done under these limitations and with her present abilities.

Work also argues that Hartford's review of her appeal was biased because Connors reopened an issue that had been determined at an early stage of her disability claim. Specifically, Work points to Connors' investigation into Work's medical records dating back to July 1999 in

24

order to determine whether Work had any preexisting back problems.  Work claims that because she did not raise that issue in her appeal, Hartford acted in a biased fashion by reopening an issue on which Hartford previously had found no evidence of preexisting back problems.  However, the evidence demonstrates that Hartford reopened the entirety of Work's claim to be reviewed in full by Dr. Roaf.  After reviewing every piece of evidence relating to Work's claim--over thirty documents spanning two years--Dr. Roaf commented on Work's inability or unwillingness to participate in the rehabilitation process at Bryn Mawr Rehabilitation and reasonably determined that Work should be able to perform her duties as an administrative assistant with the limitations described by Dr. Mansmann.  Although Dr. Roaf noted four pieces of evidence that suggest that Work had a preexisting back injury, she did not based her determination on that issue.  Rather, Dr. Roaf based her determination on Work's ability to work in a sedentary position within the limitations set forth by Dr. Mansmann.

B.      Nontreating Physicians Vs. Treating Physicians

Work appears to argue that Hartford improperly accorded greater weight to the opinions of nontreating physicians over those of her treating physicians in terminating her benefits.  As an evidentiary matter, the evidence does not show that Hartford based its decision to terminate on the report of any nontreating physician.  Moreover, as Work acknowledges, "plan administrators are not obliged to accord special deference to the opinions of treating physicians" because there is also bias and conflict of interest on the part of "a treating physician who, in a close case, may favor a finding for the patient."  Stratton v. E.I. Dupont De Nemours & Co., 363 F.3d 250, 258 (3d Cir. 2004) citing Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003).  As the Supreme Court stated in Black & Decker:

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

Black & Decker, 538 U.S. at 823-24.  Thus, any greater weight that Hartford could have accorded to its reviewing physicians over Work's treating physicians would not raise the level of scrutiny in this case.

C.      Selective Review Of Medical Records

Work appears to argue that in reviewing her claim Hartford relied solely upon the medical records that supported its determination to terminate her disability benefits and ignored evidence that supported her continued disability.  See Holdschuh v. Unum Life Ins. Co. of Am., No. 02-1035, 2002 WL 1609983, at *8 (E.D. Pa. Jul. 18, 2002); Petroff v. Verizon North, Inc., No. 02-0318, 2004 WL 1047896, at *12 (W.D. Pa. May 4, 2004).  This argument is not supported by the evidence.  Hartford based its termination of her benefits on a comparison of Dr. Mansmann's opinions of her condition and restrictions on her activities with the disability policy and job description for her sedentary position as an administrative assistant at Brandywine.  Also, Dr. Roaf's comprehensive review of Work's medical records and discussions with Drs. Kraus and Mansmann, and Hartford's reliance thereon in her appeal demonstrates that Hartford thoroughly evaluated all pieces of evidence before upholding its termination of benefits.

Nevertheless, I note that during Work's appeal Dr. Roaf focused her report on objective evidence over subjective evidence to support her determination that Work could engage in sedentary employment under certain restrictions.  Thus, by relying on Dr. Roaf's report, Hartford placed emphasis on the objective findings of Work's treating physicians over their subjective

findings as to Work's condition and degree of pain.  Although the disability benefits plan does

not require the exclusive consideration of objective evidence or disallow the consideration of

subjective evidence, an administrator should not place such a strong emphasis on objective

evidence to the exclusion of all subjective evidence, see Sanderson v. Continental Cas. Corp.,

279 F. Supp. 2d 466, 476 (D. Del. 2003) ("The court finds this strong emphasis on objective

evidence to the resulting exclusion of the subjective evidence to be improper."); Smetana v.

Reliance Standard Life Ins. Co., No. 01-4339, 2003 WL 22594263, *7 (E.D. Pa. Sep. 30, 2003)

(same).  I will therefore elevate my level of scrutiny of Hartford's denial of Work's disability

benefits under the heightened arbitrary and capricious standard of review.

D.      Paper Review

        Work argues that Hartford acted in a biased fashion during her appeal by ordering a paper

review of Work's medical records by the UDC--whose interests Work alleges are aligned with

Hartford's--to support Hartford's alleged predetermination that Work was not disabled.

Specifically, Work argues:

>       the results of Hartford's appellate review was [sic] a foregone conclusion.  Hartford
>       obtained the conclusory opinion which it had bought, paid for, and expected.  Rather than
>       provide meaningful review, Hartford's internal appeal was an artifice, by which it tried in
>       vain to assemble justification for its unfounded and improper termination of benefits.

There is no evidence in the record to support this allegation.  The evidence does not suggest that

the UDC or Dr. Roaf had an ulterior motive in creating her report for Hartford.  Rather, the

evidence shows that Dr. Roaf conducted a balanced and comprehensive review of Work's

medical records and placed special significance on Dr. Mansmann's findings and opinions as to

Work's limitations.  Specifically, Dr. Roaf recounted Dr. Mansmann's views on Work's

condition in her letter to Dr. Mansmann:

> You stated were she able to return to work she would certainly need frequent position changes, the ability to sit and stand when needed. . . . Certainly if Ms. Work were to return to work, it would be in a sedentary capacity and you felt that it is possible that she might be able to perform some part-time position at a sedentary level. You indicated that pushing, pulling, lifting more than five pounds or twisting would be appropriate.

Dr. Roaf reasonably relied on Work's treating physician's views of her condition to conclude that Work could perform her sedentary position as an administrative assistant.

Work also appears to argue that Hartford's review of Work's medical records during her appeal was arbitrary and capricious because Hartford relied on Dr. Roaf's review and analysis of the documents in her medical record rather than pursuing an independent medical examination. Work argues that "it was within Hartford's power to request an independent medical exam, to conduct interviews with the plaintiff, or to order video surveillance if it had legitimate concern that she was capable of more activity than her doctors reported." These arguments are not supported by the law. "[W]here a disability insurance policy does not specify whether the insurer can rely on the opinions of medical professionals who have not seen, spoken, or examined claimants, reliance on the review of non-treating physicians is not a procedural abnormality that demands a heightened level of scrutiny." Sweeney v. Standard Ins. Co., 276 F. Supp. 2d 388, 396 (E.D. Pa. 2003). Similarly, a plan administrator is not obligated to conduct an independent medical examination or pursue additional forms of information regarding the claimant in making its disability benefits determination. See, e.g., Thompson-Harmina v. Reliance Standard Life Ins. Co., No. 04-0425, 2004 WL 2700342, *3 (E.D. Pa. Nov. 23, 2004) ("no obligation to provide an independent medical examination"); Leonardo-Barone v. Fortis Benefits Insurance Co., No. 99-6256, 2000 WL 33666891, *13 (E.D. Pa. Dec. 28, 2000) ("while it is true that the policy allowed [the insurer] to conduct an independent medical examination, there was no requirement that it do

28

so for each claimant.  The decision to rely only upon a review of the written submissions does

not render the denial arbitrary since by doing so [the insurer] violated no provision of the

policy.").  The fact that Hartford relied on Dr. Roaf's review of Work's claim and elected not to

request an independent medical examination, conduct interviews with Work, or order video

surveillance of her activities does not render its determination arbitrary and capricious.  Nor does

this fact suggest that greater scrutiny should be applied to Hartford's determination.

Work similarly argues: "Plaintiff pleaded with Hartford to have her examined or do

anything so they could understand how serious her condition was.  Hartford never took her up on

these offers."  However, a disability plan administrator does not have an affirmative duty to

engage in further investigation of a claim or to gather more information.  Pinto, 214 F.3d at 394

n.8; McGuigan v. Reliance Standard Life Ins. Co., No. 02-7691, 2003 WL 22283831, at *20

(E.D. Pa. Oct. 6, 2003) ("Pinto makes clear that an insurance company is under no specific duty

to gather [medical] information.").

II.      Review of Hartford's Determinations

I find myself near the low end of the sliding scale because only two of the factors

discussed above implicate a higher standard of review: the relative sophistication imbalance and

Hartford's emphasis on objective evidence over subjective evidence.  Therefore, I will apply a

moderately heightened arbitrary and capricious standard to Hartford's termination of Work's

disability benefits.  I will overturn Hartford's termination of Work's disability benefits only "if it

is clearly not supported by the evidence in the record or the administrator has failed to comply

with the procedures required by the plan." <u>Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am.</u>, 222 F.3d 123, 129 (3d Cir. 2000).  I am not free to substitute my own judgment for that of Hartford in determining Work's eligibility for plan benefits.  <u>Id.</u>

Work argues that Hartford's termination of her benefits was arbitrary and capricious because "Hartford took the unrealistic position that the ability to change positions as needed was sufficient to allow plaintiff's return to her previous occupation . . . for at least two reasons." First, Work asserts that Hartford ignored Work's physical limitations because the duties of administrative assistant at Brandywine require frequent movement, in contravention of Dr. Mansmann's prescription that she be able to sit or stand as needed, and often carrying heavy binders of contract and construction documents, which are over ten pounds.  Second, Work asserts Hartford failed to take account of her time period restrictions because her position as an administrative assistant requires her to work several hours per day for a total of forty hours per week in contrast to Dr. Mansmann's opinion that Work could only sit or stand for a few hours per day.  However, Hartford's decisions to terminate Work's disability benefits and to uphold its judgment on appeal are supported by the evidence in the record and these judgments complied with the procedures required by the policy.

A.      Review of Hartford's Termination of Benefits

After comparing the disability benefits policy and Work's job description with Brandywine's claim statement and the two reports completed by Dr. Mansmann, Hartford reasonably determined that Work did not meet the definition of disability in the policy because she could continue her job as an administrative assistant by alternating her position as needed and not having to lift or carry more than ten pounds.  The policy defined disability to mean, in

30

relevant part, being prevented by accidental bodily injury or sickness from performing the essential duties of her job as an administrative assistant.  Dr. Mansmann's reports restricted her activities to never lifting, pushing, or pulling weights over ten pounds, never climbing, balancing, and reaching below waist level with the latitude to shift position as necessary.  However, Dr. Mansmann reported that Work was: still able to lift weights under ten pounds occasionally; still able to stoop, kneel, crouch, crawl, reach above the shoulder and at waist level; still able to handle, finger, and feel things; and still able to use both feet and hands.  Brandywine reported that Work's duties as an administrative assistant required her to use repetitive hand motions, such as answering phones, keyboarding, sorting mail and faxes, and filing, and could be done by alternating sitting and standing without lifting more than ten pounds.  Thus, Hartford reasonably concluded that Work was not disabled under the policy because she could perform her duties as an administrative assistant by changing positions as necessary and not lifting more than ten pounds.  I therefore find that Hartford's termination of Work's disability benefits was not arbitrary and capricious.

B.      Review of Hartford's Determination on Appeal

       Upon review of Work's pharmaceutical records, Dr. Mansmann's statement that Work "is to remain out of work", Dr. Kraus' recommendation that Work pursue a physical rehabilitation program, Dr. Bergan's letter stating that on July 2, 1999 Work was treated by Dr. Rapko for a back injury sustained while shoveling, Dr. Ward's medical records describing Work's history of chronic low back and left leg pain exacerbated by a herniated L5-S1 disc, and Dr. Roaf's comprehensive analysis of Work's medical documents, Hartford reasonably adopted Dr. Roaf's report and determined that Work was capable of full time sedentary work as an administrative

assistant with the limitations outlined by Dr. Mansmann.  Dr. Roaf's report analyzed over thirty documents spanning two years, including the other five documents above, and demonstrated a thorough understanding of Work's objective medical condition and subjective feelings of pain. Focusing on Dr. Mansmann's and Dr. Kraus' reports, Dr. Roaf found that Work's activities were restricted to sedentary actions with no lifting of items greater than ten pounds and that Work needed the ability to shift positions whenever necessary in order to alleviate pain.  However, Dr. Roaf found that Work was permitted occasionally to stoop, kneel, crouch, crawl, reach above the shoulder and waist, handle, finger, feel, and use all over her extremities.  Dr. Mansmann appeared to concur in this analysis by telling Dr. Roaf that "if Ms. Work were to return to work, it would be in a sedentary capacity and . . . it is possible that she might be able to perform some part-time position at a sedentary level.  . . . [P]ushing, pulling, lifting more than five pounds or twisting would be appropriate."   Thus, Dr. Roaf reported her opinion that Work should be able to function in her sedentary position as an administrative assistant.  Hartford reasonably relied on Dr. Roaf's detailed analysis to uphold its termination of Work's disability benefits.  I therefore find that Hartford's determination was not arbitrary and capricious.  Summary judgment will be entered in favor of Hartford.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOANNE WORK | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| HARTFORD LIFE AND ACCIDENT | : | NO. 04-2565 |
| INSURANCE COMPANY | : | |

<u>ORDER</u>

AND NOW, this 15th day of November 2005, upon consideration of the parties' cross motions for summary judgment, the parties' reponses, and plaintiff's reply thereto, and for the reasons set forth in the accompanying memorandum, it is ORDERED that plaintiff's motion for summary judgment is DENIED, defendant's motion for summary judgment is GRANTED, and judgment is entered in favor of defendant, Hartford Life and Accident Insurance Company, and against plaintiff, Joanne Work.

s/ Thomas N. O'Neill, Jr.
THOMAS N. O'NEILL, JR., J.